STATE OF NEBRASKA, APPELLEE, V. EDDIE T. WADE, APPELLANT.
581 N.W. 2d 906

Filed June 16, 1998.   No. A-97-345.

Stanley D. Cohen for appellant.

Don Stenberg, Attorney General, and Mark D. Raffety for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

HANNON, Judge.

Eddie T. Wade appeals from a jury verdict finding him guilty of two counts of distribution of a controlled substance. The convictions arise from two separate transactions in which Wade allegedly purchased drugs for an undercover police officer. It is Wade's general contention that the undercover officer misidentified him and that the man who purchased drugs for the undercover officer was instead an individual by the name of Melvin Wade Brown, who was impersonating Wade. On appeal, Wade argues that the trial court erred in failing to grant a mistrial based on statements made by the prosecuting attorney in closing argument; in sustaining the State's objection to evidence of Brown's prior drug-related conviction; and in permitting the prosecution to introduce transcripts of audiotape recordings of the transactions, prepared by the undercover officer to whom the drugs were distributed, to be used by the jury only when the recordings were played into evidence. Because we conclude that the trial court erred in failing to grant Wade's motion for a mistrial based upon highly improper and prejudicial remarks made by the prosecuting attorney during closing argument, we reverse, and remand for a new trial.

## FACTUAL BACKGROUND

The State's evidence establishes the following: On March 24, 1995, Officer Judd McKinstry of the Nebraska State Patrol was posing as an undercover officer in the Lincoln area and was

working with a confidential informant in order to "make intro-
ductions . . . to attempt to purchase controlled substances." At
approximately 6:15 p.m., McKinstry accompanied the confi-
dential informant to 2532 Vine Street, No. 6, the address of the
confidential informant, where McKinstry was introduced to an
individual named "Ed." It is undisputed that there were other
individuals also present in the apartment that evening.
According to McKinstry, after some general conversation, Ed
agreed to purchase one-eighth of an ounce of powder cocaine
for McKinstry. McKinstry gave Ed $275 with which to pur-
chase the cocaine, and Ed gave McKinstry his wallet to hold as
a type of collateral but took his driver's license with him.
However, McKinstry testified that he was able to see the
driver's license and that the individual pictured in the license
appeared to be the same individual as Ed. In the wallet,
McKinstry found a Social Security card with the name "Eddie
T. Wade." McKinstry also saw credit cards but did not look at
the name on the cards.

Ed returned without any cocaine and gave McKinstry the
$275 back. Later, McKinstry and Ed engaged in conversation as
to whether Ed could obtain crack cocaine instead. Ed stated that
he was able to purchase such, and McKinstry gave him $50 with
which to purchase crack cocaine. Ed returned with a "rock" and
gave it to McKinstry. A subsequent laboratory test revealed that
the rock contained cocaine base. McKinstry testified that he
worked in an undercover capacity for approximately 2 hours
that evening and that the actual contact with Ed lasted from 1 to
1½ hours.

On the evening of March 30, 1995, McKinstry again met Ed
at the same apartment. Upon initial contact, Ed stated that "if
we wanted some that we had to go right away," referring to the
one-eighth ounce of cocaine, and further that "his source was
waiting for us to arrive." McKinstry and Ed then drove to 20th
and J Streets and parked at the rear of an apartment building.
Again, as collateral for McKinstry's $275, Ed handed
McKinstry his wallet, which included his driver's license. Five
minutes later, Ed returned with a small zip-lock plastic baggie
containing a white powdery substance. The two then drove to
3038 Walnut, No. 3, in order that Ed could " '[r]ock up' " some

of the powder to prove to McKinstry that it was a good quantity of cocaine and would rock up into crack cocaine. In the presence of an unidentified white female, Ed rocked up some of the cocaine. According to McKinstry, right before Ed began cooking the cocaine, Ed handed him the plastic baggie of what was later determined to be cocaine.

The events of March 24 and 30, 1995, were monitored and recorded by the Nebraska State Patrol. At trial, audiotape recordings of the events were admitted into evidence. The State also offered transcripts of the recordings which had been prepared by McKinstry. McKinstry testified that in the transcripts, he identified some of the individuals who were speaking. Among other things, the recordings contain McKinstry reading the Social Security card found in the wallet, the confidential informant calling the individual arranging the deals "Ed," and Ed referring to his "old lady," his "kids," and himself as "Ed." At this point, because it is relevant to Wade's defense that Brown was the individual who distributed drugs to McKinstry, we note that while the record reveals that Wade was married and had children, there is no evidence that Brown was married or had children.

McKinstry admitted that he was not able to make out everything from the recordings and that he noted such in the transcripts with the word "inaudible." Over Wade's objections, the court admitted the transcripts of the recordings for the limited purpose of assisting the jury in listening to the recordings. With regard to the recording from March 24, the judge instructed the jury as follows:

> Now, because the tape is difficult to understand — you are — that's what's really being received in evidence as far as you are concerned, and the rest is just for the record. In other words, what I want you to do is listen to the tape, you'll be given the transcript as to what the officer says the tape sounds like, but you are to rely on your own judgement. In other words, if your judgement differs from the officer['s] as to what the tape says, you are to rely on your judgement and not his. His is merely to assist you, his may be wrong, you — it's your judgement that counts. So you decide what the tape says. The transcript is only for your

assistance in it, not to rely on, but to help you decide what it says, because it is tough to hear.

Concerning the recording from March 30, the judge instructed the jury as follows:

[Y]ou will not be given that tape to take back — or that transcription to take back to the jury, just as you will not be given the transcription of the previous tape. However, I am receiving it for the limited purpose of completing the record and also, to give you — you can have it during the period of time that you are listening to the tape. Again, the same admonishment applies, you're to rely upon your own judgement, that the transcription is given to you as what this officer thinks was said on the tape, if there is any question in your mind, you're to believe your own judgement, rather than the interpretation played by the officer. In other words, you as the trier of fact decide what the tape says, because it's sort of hard, we're giving you a transcription to assist you to the extent that you need it or want to use it. But, again, I caution you that it's your judgement as to what that tape says is important, not the officer's, he's just a witness.

At trial, McKinstry identified Wade as the individual from whom he purchased cocaine on March 24 and 30. McKinstry testified that his identification was based upon his personal contact with Wade. McKinstry further testified that he had seen pictures of Brown and that he had never purchased cocaine from Brown.

The defense produced the following evidence: Wade's wife, Alberta, testified that at the preliminary hearing, she was sitting two seats behind the prosecutor and observed McKinstry walk in and ask the prosecutor, "Where's Wade?" and that "the prosecutor pointed." (We assume she meant that the prosecutor pointed to Wade.) However, McKinstry testified that he told the prosecuting attorney that the man seated at the defendant's table was the individual he had purchased controlled substances from and further that he did not ask the prosecuting attorney whether that individual was Wade.

O.C. Love, Wade's son, also testified about an incident which apparently took place in January 1996 in which McKinstry

came to Wade's house to talk to O.C. and his brother, "Eddie Love, Junior." According to O.C., after determining who Eddie, Jr., was, McKinstry looked at Wade and said, "So, you must be Eddie." McKinstry testified that he recognized Wade upon contact, and in response to questioning on how he greeted Eddie, he replied, "I believe the exact terminology was Eddie, then I said, this is Investigator McKinstry."

Briefly summarized, Wade's evidence consisted of alibi testimony as well as testimony that at the time of the transactions, Brown was impersonating him. Wade and Alberta testified that on the evening of March 24, Wade was playing his weekly game of dominoes with his friend, Robert Griffin. However, Griffin could not specifically recall if they had played dominoes that night. Wade and Alberta further testified that they spent the entire day of March 30 together because it was her birthday, and a family friend, Linda Wilson, testified that Wade and Alberta were at her place that evening between 7:15 and 9:30 p.m. Wade also testified that he kept his driver's license in the visor of his car and that at some point, his Social Security card was missing.

Concerning Brown, Alberta, who admittedly was involved in an "[i]ntimate relationship" with him from 1994 to 1996, testified that Brown and Wade had the same skin color and were about the same height and weight. Alberta further testified that Brown combed his hair like Wade combed his; wore similar clothing, including some of Wade's; imitated Wade's manner of walking; and held himself out to others as Wade, sometimes with her approval. Alberta also testified that Wade did not have any credit cards.

Wade himself testified that he did not own the clothes that McKinstry testified he was wearing on the dates of the transactions. Wade also attempted to introduce evidence that Brown had been convicted of a prior drug offense. However, the court sustained the State's objection to such evidence. We address this topic more specifically later in the opinion.

Wade was arrested in June 1996. The jury found Wade guilty of both counts of distribution of a controlled substance, and the court sentenced him to consecutive sentences of not less than 1 or more than 2 years' imprisonment. Wade now appeals.

## ASSIGNMENTS OF ERROR

Wade argues that the court erred (1) in failing to grant his motion for mistrial when the prosecuting attorney told the jury in closing argument, " 'Don't underestimate [defense counsel]; He's good! He's got a killer off' "; (2) in failing to grant a mistrial

> after prosecutor argued in closing that unknown and unnamed persons called the distributor "Eddie" and that was an identification of the Defendant; especially after defense was denied the name of the confidential informant so it could determine who was present and whether those present would identify Eddie Wade or Melvin Wade Brown as "Eddie";

(3) in denying him the right to show that Melvin Wade Brown had a conviction for distributing a controlled substance and was sentenced to prison for the same in order to show that the "offense was consistent with defense position" that Brown and not Wade committed these offenses; and (4) in permitting the prosecuting attorney to distribute a transcript to the jury of "what the prosecutor and his witnesses thought the tape recordings said."

## STANDARD OF REVIEW

■ On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts. *State v. Howell*, 254 Neb. 247, 575 N.W.2d 861 (1998).

## ANALYSIS

*Prosecutor's Closing Arguments.*

Wade contends that the trial court erred in failing to grant his motion for mistrial based upon the comments of the prosecuting attorney during oral argument. Although the closing arguments were not made part of the bill of exceptions, the bill of exceptions does reveal that after a jury instruction conference in which the court determined that it would allow each side 45 minutes for closing argument, the judge stated, "Okay. Off the record." The record then reflects "- - -," presumably indicating that some part of the proceedings were not transcribed by the

court reporter. The record then contains a short paragraph in which the court dismissed the alternate juror. This paragraph is then followed by another " - - -."

The transcribed proceeding which follows is Wade's motion for a mistrial, which was made outside the presence of the jury. According to Wade, the grounds for mistrial were that (1) the statement "Don't underestimate [defense counsel], he's good, he got a killer off" was prejudicial and (2) unknown and unnamed persons referred to the distributor as "Eddie." With regard to the first alleged ground, the prosecuting attorney responded, "I think if I did say that, I — and I'm not saying that I didn't, because I believe it's very possible that I did."

Concerning the second alleged ground, Wade complained that

> they could listen to those other voices [on the audiotape recordings], the identity of whom we don't know, that they said, Hi Eddie, and because one of the witnesses that I did call, Oscar Love[,] said that people knew Eddie in the community and knew Melvin Brown in the community, that they could draw the conclusion that these people who said hi Eddie, on the 24th of March, 1995, knew Eddie. And my problem with that is that it is an impermissible conclusion, or even inference because it denies [Wade] the right to confront his witnesses. It's bad enough we have a confidential informant that we cannot confront, now we have four or five people who's [sic] names they don't know and we don't know, who are not supposedly — we're supposed to take their word for it that they can identify my client.

The second basis for Wade's motion for mistrial is neither clear nor understandable. More importantly, however, the audiotape recordings do reflect that the confidential informant referred to Wade as "Eddie." Thus, the prosecuting attorney's statement was entirely accurate. As such, we need only consider the first alleged ground.

The State dismisses both issues of alleged misconduct by relying on the following language:

> A bill of exceptions is the only vehicle for bringing evidence before the Supreme Court. *State v. Spurgeon*, 200

Neb. 719, 265 N.W.2d 224 (1978). Opening and closing statements must appear in the bill of exceptions before alleged errors concerning them can be reviewed. *Peery v. State*, 165 Neb. 752, 87 N.W.2d 378 (1958). In *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980), we held that in order to predicate error upon an improper argument to the jury, it is necessary to make an objection, receive an adverse ruling thereon, and have the same made part of the bill of exceptions.

*State v. Manchester*, 213 Neb. 670, 681-82, 331 N.W.2d 776, 783 (1983).

■The above authority relied upon by the State is of course binding. However, the State overlooks the more factually relevant and controlling authority detailed below. In a more recent case, the Nebraska Supreme Court stated: "[W]e have consistently held that in order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to the improper remarks no later than at the conclusion of the argument." *Wolfe v. Abraham*, 244 Neb. 337, 343, 506 N.W.2d 692, 697 (1993) (where allegedly improper remarks were contained in record). While such language does not focus on the specific issue in this appeal, we observe that in *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980), where the record did not contain the closing arguments, including the allegedly improper comment of the prosecutor, the Nebraska Supreme Court stated:

> Much of the difficulty with which we are presently confronted would have been easily eliminated had counsel, at the conclusion of the closing arguments, asked for the court reporter and made an offer of proof. Having failed to do that, we are totally at a loss to know what in fact took place.

*Id.* at 851, 290 N.W.2d at 650.

The *Harris* court also cited *Sandomierski v. Fixemer*, 163 Neb. 716, 81 N.W.2d 142 (1957), *superseded on other grounds, Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986). In *Sandomierski*, the closing arguments were not recorded, and no objections to the allegedly improper statements were made during the argument. However, at the close of argument, the

reporter was called, and the allegedly improper statements were dictated into the record. The correctness of the statements as dictated was not challenged. The *Sandomierski* court, after observing that it had not previously decided whether an objection to the remarks of counsel made at the close of argument was timely, stated:

> Attorneys engaged in the trial of cases to a jury know or ought to know the purposes of arguments to juries. When they depart from the legitimate purpose of properly presenting the evidence and the conclusions to be drawn therefrom, they must assume the responsibility for such improper conduct. They are in no position to demand that opposing counsel shall jeopardize his position with the jury by constant objections to their improper conduct.

*Id.* at 719, 81 N.W.2d at 145. The court thus concluded that the objection to the remarks of counsel as misconduct had been timely made.

The *Sandomierski* court next considered whether such improper conduct by counsel could be raised when the court reporter had not transcribed the complete argument. In concluding that it could be raised, the court stated:

> The failure of the court reporter to take the oral arguments does not relieve attorneys from the necessity of making proper arguments, nor deprive opposing counsel of the right to make timely objections thereto. It is the duty of the trial court to see to it that oral arguments are properly confined to their purposes, and where objection thereto is made, to see that an accurate record is made for the purpose of making a correct ruling and providing a proper basis for review on appeal. The trial court properly protected the record in the instant case.

*Id.* at 720, 81 N.W.2d at 146.

Therefore, based upon *Harris* and *Sandomierski*, we conclude in the present case that the record in the bill of exceptions is sufficient to consider the assigned error alleging misconduct of counsel in closing arguments. We now analyze whether the court should have granted Wade a mistrial.

A mistrial is properly granted in a criminal case where an event occurs during the course of the trial which is of such a

nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus would result in preventing a fair trial. *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998). The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *Id.*

The Nebraska Supreme Court in *State v. Casados*, 188 Neb. 91, 96, 195 N.W.2d 210, 214 (1972) (where prosecutor referred to defendant as " 'despicable' " person and stated evidence showed defendant was "the most lowly person the jury would have occasion to judge" and further that defendant was "a pimp"), has stated:

> Inflammatory or vindictive remarks by a prosecutor during a closing argument often are not considered sufficiently prejudicial to constitute error. It is difficult to analyze the dividing line between prejudice and lack of it. Courts are invariably quick to condemn all such practices, even where they find no prejudice. . . .
>
> It is a fundamental concept of our criminal law that an accused, whether guilty or innocent, is entitled to a fair trial. It is not only the duty of the trial court but of the prosecutor as well to see that he gets one. A prosecution solidly based upon the law and the facts and supported by sound reasoning does not require bolstering by appeals to passion and prejudice. . . .
>
> . . . "It is the duty of a prosecuting attorney to conduct the trial in such a manner as will be fair and impartial to the rights of the accused, no matter how guilty he may be. * * * Where the defendant has been prejudiced, the conviction will be set aside." [Quoting from *State v. Smith*, 187 Neb. 152, 187 N.W.2d 753 (1971).]

*Id.* at 97-98, 195 N.W.2d at 214-15.

The allegedly improper comment of the prosecutor in *Sandomierski v. Fixemer*, 163 Neb. 716, 718, 81 N.W.2d 142, 145 (1957), was, " 'It's easy for [defense counsel] to go cruising through life in his Cadillac.' " In concluding that the trial court erred in overruling the defendant's motion for mistrial, the Nebraska Supreme Court stated that such a reference to opposing counsel was

> highly improper and should not be tolerated by the trial judge. While we may be unable to determine the purpose of such a statement in an argument to a jury, we must assume that it was intended to aid the cause of the party on whose behalf it was made.

*Id.* at 722, 81 N.W.2d at 147. Because the offending attorney was not reprimanded, the jury was not admonished, and steps were not taken to secure a fair trial on the issues and evidence, the court concluded that counsel's arguments constituted such misconduct as to require a reversal of the judgment.

▆ The same conclusion is warranted here. Despite the prosecuting attorney's later attempts to explain the meaning behind his comment, it is obvious that the language was extremely improper and prejudicial. The clear effect of the comment was to suggest that defense counsel was able to obtain acquittals for guilty defendants. Not only is such a statement prejudicial to the defendant, but it also strikes against the underpinnings of our system of criminal jurisprudence. As set forth above, it is well settled that prosecuting attorneys have a duty to conduct trials in a fair and impartial manner, no matter how guilty the defendants may be. *State v. Casados, supra*; *State v. Smith*, 187 Neb. 152, 187 N.W.2d 753 (1971). In essence, the prosecuting attorney in this case breached that duty.

Moreover, we recognize the Nebraska Supreme Court's reluctance to help the State out of the holes that it digs for itself. "It must be impressed upon the State that this court will not continually search for ways to extricate the prosecution from the results of its own misconduct by labeling such action 'harmless error.'" *State v. Johnson*, 226 Neb. 618, 622, 413 N.W.2d 897, 899 (1987). Based on the foregoing authorities, we conclude that the court abused its discretion in failing to grant Wade's motion for a mistrial. However, because the issues raised on appeal will undoubtedly be issues on retrial, we feel compelled to address the remainder of Wade's assigned errors.

*Identity of Confidential Informant.*

Though not assigned as error in his brief, Wade also argues that the court erred in failing to sustain his motion to compel the disclosure of the identity of the confidential informant.

Disclosure of the identity of an informant is a matter of judicial discretion. *State v. Brown*, 5 Neb. App. 889, 567 N.W.2d 307 (1997). Neb. Rev. Stat. § 27-510(1) (Reissue 1995) grants the State "a privilege to refuse to disclose the identity of a person who has furnished information relating to or assisting in an investigation of a possible violation of law . . . ." However, § 27-510 also places certain limitations on this privilege. Section 27-510(3)(b) provides in pertinent part:

> If it appears from the evidence in the case or from other showing by a party that an informer may be able to give testimony necessary to a fair determination of the issue of guilt or innocence in a criminal case . . . and the government invokes the privilege, the judge shall give the government an opportunity to show in camera facts relevant to determining whether the informer can, in fact, supply that testimony. The showing may be in the form of affidavits or testimony, as the judge directs. If the judge finds that there is a reasonable probability that the informer can give the testimony, and the government elects not to disclose his identity, the judge on motion of the defendant in a criminal case shall dismiss the charges to which the testimony would relate, and the judge may do so on his own motion.

Overlooking the fact that Wade did not properly assign the trial court's failure to grant his motion to reveal the identity of the confidential informant as error, we observe that Wade also failed to include the relevant proceedings in the bill of exceptions.

A hearing on Wade's motion was held on November 12, 1996, at which time the court admitted the transcript of Wade's preliminary hearing. A journal entry dated November 14, 1996, reveals that the court sustained Wade's motion in part and ordered the State to make an in camera showing. A journal entry dated December 23, 1996, further reveals that the court, "[h]aving considered the in camera showing filed with this court on 11-25-96," overruled Wade's motion "for the reason the said confidential informer would not give testimony consistent with defendant's alibi defense." However, the bill of exceptions does not contain any affidavits filed or evidence adduced on November 15, or any other date for that matter, pertaining to the in camera proceedings. A bill of exceptions is the only vehi-

cle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered. *State v. Williams*, 253 Neb. 111, 568 N.W.2d 246 (1997), *cert. denied, Williams v. Nebraska*, 522 U.S. 992, 118 S. Ct. 555, 139 L. Ed. 2d 397. It is incumbent upon the party appealing to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court is to be affirmed. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994). Because the relevant proceedings were not made a part of the bill of exceptions, we do not address the merits of Wade's argument.

*Transcripts of Audiotape Recordings.*

Wade also asserts that the court erred in admitting the transcripts of the audiotape recordings which were prepared by McKinstry. In *State v. Loveless*, 209 Neb. 583, 308 N.W.2d 842 (1981), the trial court admitted a recording, which was played to the jury, and a transcript of the recording, which was prepared by an officer who had listened to the recording more than 50 times. The defendant argued that such admission was error. The Nebraska Supreme Court disagreed, stating:

> There is no question, and there are a legion of cases so holding, that one who was present and who heard the conversation in question at the time the recording was made may testify for the purpose of clarifying inaudible or unintelligible portions of the tape. However, as the defendant in this case points out, Officer Warden was not present at the time the conversation between Gitchell and Kulakofsky occurred in the rear seat of the police cruiser, and hence defendant contends Warden should not be permitted to testify as to the contents of the tape recording in question. This same question was addressed in the case of *United States v. Onori*, 535 F.2d 938 (5th Cir. 1976). In that case the court permitted the testimony of an expert in tape identification to point out alleged errors in the government's transcript of the conversation in question. The court also in its opinion pointed out the reasons for the necessity of the use of a transcript of a tape recording, stating: "The need or desire for transcripts arises generally

from two circumstances. First, portions of a tape may be relatively inaudible. Second, without the aid of a transcript, it may be difficult to identify the speakers. In either of these cases, it has been said that it is within the discretion of the trial court to allow a transcript to be used by the jury 'to *assist the jury as it listens to the tape.*' . . .
. . . .

"It is therefore incorrect to think of the transcripts as simply an 'aid' — as better lighting fixtures in the courtroom would be an 'aid' to the jury's vision of witnesses — and not as evidence of any kind. They are evidence and, like other evidence, may be admitted for a limited purpose only. That purpose here, as the court outlined in its special instruction, was primarily to establish the identity of the speakers at any particular time." *Id.* at 947.

*Id.* at 590-91, 308 N.W.2d at 847.

In *State v. Loveless, supra,* the court found that it was permissible for experts, by virtue of their experience, to testify with regard to the contents of audiotape recordings. "The weight to be given to the evidence contained in the tape recording and transcript was, we believe, properly a matter for the jury's determination." *Id.* at 591, 308 N.W.2d at 847.

In comparison, McKinstry's transcription seems more reliable than Warden's because, unlike Warden, McKinstry was actually present and an active participant in the recorded conversations. While there was no evidence presented establishing McKinstry's expertise, McKinstry testified that he prepared the transcripts while reviewing the recordings, using his knowledge from being present at the time of the transactions. As stated above, it is well established that one who is present and hears the conversation in question at the time the recording is made may testify for the purpose of clarifying inaudible or unintelligible portions of the recording. *State v. Loveless, supra.* Additionally, the court specifically instructed the jury that the transcripts were to be used only as assistance in following the recordings and that they, as the finders of fact, were free to rely on their own judgment of what the recordings said rather than McKinstry's. We have reviewed the recordings and find that while many portions are inaudible, many are also understand-

able. With regard to the transcript, we find that it accurately reflects the decipherable statements and is of great value in helping the listener follow the conversations and identify the speakers. We conclude, based upon *State v. Loveless, supra,* that the court properly admitted the transcripts for the limited purpose of helping the jury follow along with the recordings.

*Evidence of Brown's Prior Drug Conviction.*

Lastly, Wade argues that the court erred in excluding evidence of Brown's prior drug conviction in Wade's attempt to show that Brown was the individual who distributed drugs to McKinstry. As explained by Wade's counsel at trial:

> I think what I'm trying to show by way of a defense is that someone like my client with 41 — who's 41 years old at the time all this happens with no record versus somebody who looks like him who has a record . . . .
>
> . . . .
>
> . . . That the odds are that it's somebody who has all ready done something that is the more likely candidate than is somebody who is starting a career late in life. And I think that fact that this guy has a record and in fact, he has a record for drugs, the same kind of conviction they're trying to convict my client on, that makes him a better prospect . . . .

Wade's counsel continued: "My feeling here is that under 404, this goes to the identity of the person responsible for distributing the cocaine in this case. . . . [O]ur effort here is to further show that it was Melvin Brown and not Eddie Wade that was the proper party defendant."

█ Neb. Rev. Stat. § 27-404(2) (Reissue 1995) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

█ Section 27-404(2) is a rule of inclusion, rather than exclusion, and it permits the use of evidence of prior activity except to prove the character of a person in order to show that

the person acted in conformity with that character. *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998); *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). In *State v. Gardner*, 1 Neb. App. 450, 498 N.W.2d 605 (1993), this court held that pursuant to § 27-404(2), an accused may offer evidence of prior crimes, wrongs, or acts of a third party, subject to the same requirement that the evidence be offered for a relevant purpose other than proving the propensity of the third party to commit an act that he or she is presently accused of. Compare *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993) (evidence of acts of third party to show that defendant acted reasonably in defending herself was irrelevant and therefore inadmissible in context of § 27-404(2)).

An appellate court reviews the admission of other acts under § 27-404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Kirksey, supra; State v. Freeman, supra.* Because the exercise of judicial discretion is implicit in Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under § 27-404(2) and Neb. Rev. Stat. § 27-403 (Reissue 1995), and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Freeman, supra.* See, also, *State v. Kirksey, supra.*

At trial, the State objected to Wade's attempts to introduce evidence showing that Brown had been convicted of a drug offense. The court sustained the State's objections. At the relevant times, Wade made offers of proof outside the presence of the jury. Wade's first offer of proof consisted of testimony by Wilson that Brown had told her that he had been convicted of "drugs" and that in the 3 or 4 years that she had known Brown, he had been "in and out" of prison. However, Wilson did not specify the type of drug offense of which Brown had been convicted. Wade's second offer of proof consisted of a certified copy of a Lancaster County computer printout of "Judges

Minutes" in a criminal case in which Brown was the defendant. The printout reflects that Brown pled guilty to "count I of information as amended by interlineation," which was "attempted unlawful manufacture/distributing of controlled substance." While there is no date listed for Brown's plea, the printout does reveal that the charge which Brown pled guilty to was amended by interlineation on August 25, 1995.

First, assuming without deciding that the evidence was relevant, it is clear that the evidence did not have a proper purpose. Where there is an overwhelming number of significant similarities, the evidence of prior acts may be admitted. *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), *overruled on other grounds, State v. Freeman, supra.* The question is whether the crimes are so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature. *State v. Carter, supra.* Based upon the limited facts presented in the offers of proof, we observe that there appear to be few, if any, similarities between Brown's prior conviction and the transactions at issue here, other than that they both relate to drugs and both occurred in Lancaster County. Specifically, the offers of proof fail to contain facts demonstrating the specific time, location, or method of the offense. In fact, we suspect that Brown's conviction has common features with many crimes that are committed every day in Lancaster County. Because there is nothing "so similar, unusual, and distinctive" about these crimes that the trial judge could reasonably have found that they bore the same signature, we conclude that the trial court did not abuse its discretion in refusing to admit the proffered evidence.

Second, it is clear from defense counsel's argument at trial that the real purpose of admitting the evidence was to show that Brown had acted in conformity with his past drug conviction. As made clear in *State v. Gardner*, 1 Neb. App. 450, 498 N.W.2d 605 (1993), such is precisely the type of evidence that is explicitly inadmissible under § 27-404(2). See *State v. Nauslar*, 94 NCA No. 24, case No. A-93-580 (not designated for permanent publication). On appeal, Wade argues that the evidence was not offered to show propensity, but, rather, to establish the identity of the person who distributed the drugs to McKinstry. Wade misunderstands the concept of identity.

Identity, as used in § 27-404(2) means a particular method of operation, see, *State v. Coleman*, 241 Neb. 731, 490 N.W.2d 222 (1992), and *State v. Evans*, 235 Neb. 575, 456 N.W.2d 739 (1990), or "little more than the logical conclusion which flows from other crimes evidence advanced in proof of plan, design, scheme or modus operandi." 29 Am. Jur. 2d *Evidence* § 452 at 519 (1994). Evidence which tends to show a course of conduct, scheme, or design is admissible to prove identity although such evidence relates to other offenses. *State v. Walker*, 200 Neb. 273, 263 N.W.2d 454 (1978). The fact of the matter is that simple proof of a person's prior drug activity does not prove identity except insofar as the trier of fact assumes the person acted in conformity with the prior drug activity. Such is clearly an improper purpose under § 27-404(2).

*Excessive Sentences.*

Wade finally argues that the court erred in imposing excessive sentences. However, our reversal of Wade's convictions renders that issue moot.

## CONCLUSION

We conclude that the prosecuting attorney's remarks about defense counsel at closing argument were prejudicial and warrant reversal. We therefore reverse, and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.