IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. BOWMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
SAMUEL D. BOWMAN, APPELLANT.

Filed December 16, 2014.    No. A-14-029.

Appeal from the District Court for Dawson County: JAMES E. DOYLE IV, Judge. Affirmed.

Chad J. Wythers, of Berry Law Firm, for appellant.

Jon Bruning, Attorney General, and Melissa R. Vincent for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a traffic stop, Nebraska State Trooper Bethany Bauer seized two packages of cocaine contained inside a spare tire located underneath a rental minivan that Samuel D. Bowman was driving eastbound on Interstate 80. Bowman filed several pretrial motions to suppress the evidence of the seized cocaine, which were overruled by the district court for Dawson County. Following a jury trial, Bowman was convicted of possession with intent to distribute a controlled substance (cocaine), weighing 140 grams or more, and was sentenced to a minimum and maximum of 20 years' imprisonment. On appeal, Bowman argues evidence of the cocaine should have been suppressed for a variety of deficiencies in the search and seizure leading to the discovery of the cocaine. Bowman also argues there were deficiencies during trial, namely, that the State's chemist did not provide adequate foundation that the scale she used to weigh the seized cocaine was calibrated and that during closing arguments, the State improperly referred to Bowman's silence and request for an attorney as evidence of his guilt. For the following reasons, we affirm.

- 1 -

## II. BACKGROUND

On November 28, 2011, Bauer initiated a traffic stop of a silver minivan traveling eastbound on I-80. As Bauer approached the passenger side of the minivan, she observed that all of the back passenger seats were gone except for one and that there was a "doughnut" spare tire (doughnut tire) in the back cargo area, which she testified was "odd" because it was not where a spare tire would be in that type of minivan. Bauer also observed duffelbags and a milk crate with mechanical supplies, including gas or antifreeze, inside the minivan.

Bauer made contact with the occupants of the vehicle. Bowman was driving the minivan, and Donzell Williams was in the front passenger seat. Bauer advised Bowman that she stopped him for driving in excess of the posted speed limit, and she asked Bowman for his driver's license, registration, and proof of insurance. Bowman informed Bauer that the minivan was a rental vehicle and provided her with a rental agreement and his Nevada driver's license. The rental agreement reflected the minivan was rented in Las Vegas, Nevada, on November 26, 2011, and was due back in Las Vegas on November 28, by 10 p.m. (within a few hours of the traffic stop). Bauer found this significant because at the time she stopped the minivan, it was still traveling eastbound. Bauer collected Bowman's driver's license and the rental agreement, and she asked him to come to her patrol car. Bowman complied.

Bauer began entering Bowman's information into the patrol car's ticket writing system to give him a warning for speeding. Bowman was seated in the front passenger seat of Bauer's patrol car. As Bauer was writing the warning, she began asking Bowman questions about his trip. Bowman first told Bauer that he and Williams, who he called his brother, were traveling to Chicago, Illinois, to pick up Williams' children, but later he told Bauer they were traveling to Chicago for a birthday party for one of Williams' children who was turning 5 years old. Bauer requested that dispatch check the status of Bowman's driver's license and run a check of his criminal history. Bauer was advised that Bowman had a valid driver's license, but that he had a positive criminal history for drug offenses.

Bauer testified that she could not complete the warning without entering all of the minivan's information into the system, so she returned to the minivan to locate its registration. Bauer made contact with Williams, who was still seated in the minivan's front passenger seat, and asked him where they were going. Williams replied they were going to Chicago to see family and that one of his children was turning 6 years old. Williams also spontaneously stated that his mother was a "cop" with the Chicago Police Department and that he and Bowman were brothers.

Bauer returned to her patrol car to check for warrants and criminal history for Williams. Bauer had noticed some discrepancies between Bowman's and Williams' statements, so she tried to clarify with Bowman. Bauer asked Bowman what his mother did for work, and he replied the family they were visiting did not have jobs, which conflicted with Williams' statement that their mother was a "cop." Bowman then clarified that he and Williams were not actually brothers, but called one another brothers because they have known each other for a long time.

Bauer completed the warning, printed it off, and handed it to Bowman. Bauer also returned to Bowman the minivan's paperwork and Bowman's and Williams' driver's licenses. Bauer explained to Bowman that he did not have to do anything further for the warning. Bauer

testified that as Bowman grabbed the patrol car's door handle to open the door, she asked him if she could ask him a few more questions, if he had time. According to Bauer, Bowman pulled the door shut and continued to speak with her.

Bauer began asking Bowman a series of questions regarding whether he had guns, weapons, or large amounts of cash. Bauer testified that Bowman's demeanor changed when she began asking about drugs and that he turned away from her and stopped looking her in the eye. Bauer then asked Bowman if he would consent to a search of the minivan and its contents. According to Bauer, Bowman verbally replied yes. Bauer then produced a written voluntary search consent form, which Bauer testified Bowman signed.

Bauer told Bowman that he could stay in the front seat of her patrol car during the search because it was a cold and windy day and that he could honk the horn to get her attention if he wished to discontinue the search. Bauer tucked the written consent form in the visor on the driver's side of the patrol car. Bauer called for assistance and returned to the minivan. Bauer told Williams that Bowman had given her consent to search the vehicle and its contents. Williams was cooperative and gave permission to search his bag. Bauer instructed Williams to take a seat ahead of the minivan in the "road ditch" during the search.

Investigator Mike Dowling arrived to assist Bauer. During the search, Dowling stood at the passenger-side door of Bauer's patrol car to observe Bowman. Nebraska State Trooper Ken Moody arrived shortly thereafter and assisted Bauer with the search. Bauer testified she observed a doughnut tire laying in the back of the minivan, without being in a container or tire compartment. Moody also testified that it was "very odd" that there was a doughnut tire laying in the cargo area of the minivan. Moody knew someone who had the same type of minivan and knew the spare tire carrier was underneath the vehicle. Bauer looked underneath the vehicle and saw there was another tire inside the spare tire carrier.

Bauer observed that the tire inside the carrier was a standard-sized tire, not a doughnut tire. Moody observed that the tire did not seem to fit or belong in the carrier. Both troopers observed that the tire appeared to be older because the tread was thin. Bauer observed that there was a chunk of tread missing and that the tire had chalk writing on it. Neither Bauer nor Moody believed the tire was roadworthy. Bauer asked Bowman why he had two spare tires, and he replied he asked the rental company to provide him with another tire for the trip because he did not feel a doughnut tire was sufficient for travel. Bauer testified the information given to her by Bowman seemed suspicious given the condition of the tire.

Moody testified that when he bounced the tire, he felt a "second bounce" or the vibration of something else inside the tire.

Bauer retrieved a stethoscope and mallet from her patrol car to perform an "echo" or "ping" test on the tire, which test she had learned during a drug interdiction course. Bauer testified the echo test was the most telling thing for her that there was possibly contraband inside the tire and that she then determined the tire needed further inspection. The troopers had no means of separating the tire from the rim on I-80, so Bauer transported Bowman and the tire to a local auto dealership in Lexington, Nebraska, approximately 3 miles away from the location where Bowman was initially stopped. Moody stayed at the scene with Williams.

The tire was taken apart at the tireshop, and inside the wheel were two black plastic wrapped items. Inside the black plastic packages were four bags with white powdery substances

inside, which Bauer believed was cocaine. Bauer then advised Bowman he was under arrest, advised him of his *Miranda* rights, and asked if he wished to make any statements. Bowman shook his head no. Bauer transported Bowman to the jail. During the booking process as Bauer went through Bowman's property, Bauer discovered the written consent form, crumpled and torn, inside the minivan's rental papers.

Bauer testified that although her patrol car is equipped with a video and audio recording device that is automatically activated when the emergency light bar is activated, there was no audio recording of the traffic stop from her vehicle. Bauer's video recording device did record the entire stop, and Moody's audio and video recording device recorded the stop after he arrived at the scene. Bauer testified that she must have accidentally turned off her audio earlier in the day. Bauer testified that the rental minivan and spare tire were released back to the rental company within days of the traffic stop.

The State filed a complaint in county court against Bowman on November 29, 2011, and an information in district court on December 19, charging him with one count of possession of a controlled substance with intent to distribute cocaine weighing 140 grams or more.

On February 2, 2012, Bowman filed a motion to suppress the cocaine seized from the minivan.

On June 6, 2012, Bowman filed a "Motion to Produce Items of Evidence for Inspection, or, in the Alternative, Dismiss the Pending Case or, in the Alternative Suppress the Results of the Physical Tests." Bowman sought to inspect the rental minivan that he had been driving and the spare tire which purported to hold the cocaine. If the items were no longer in State custody, Bowman sought to exclude the results of the ping or bounce tests performed by Bauer and Moody or, in the alternative, for an adverse inference based upon spoliation. On the same date as the above motion, Bowman filed a motion seeking that the State provide any recording of his alleged consent to the search, alleging that the recording was intentionally altered (by not recording it as was routine practice), and if the recording was unavailable, requested that his consent be suppressed on a theory of spoliation or, in the alternative, apply a negative inference to the issue of voluntary consent. Finally, Bowman filed a motion for a *Daubert* hearing regarding the troopers' use of the bounce and ping tests on the spare tire. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Bowman filed an amended motion to suppress on July 2, 2012, challenging the "legality of the entire encounter" with law enforcement due to lack of probable cause, reasonable suspicion, illegal detention, statements given in violation of *Miranda*, questioning outside the scope permitted by law, search of vehicle without consent or outside the scope of consent, and search after consent was withdrawn.

A hearing on Bowman's various motions was held on November 30, 2012, and February 8, 2013. Bauer, Moody, and Dowling testified on behalf of the State, as generally outlined above. Bowman testified in his own behalf. Bowman testified that he was not speeding, as his cruise control was set at the speed limit; he did not feel free to leave while in the passenger seat of Bauer's patrol car and that the door was locked; he did initially consent to the search, but after Bauer asked him to sign the written consent, he refused to sign and told her he no longer wanted her to perform the search; he told Dowling he wanted the search to stop on five occasions; and the doughnut tire was already in the cargo area of the minivan when he rented it.

On February 14, 2013, Bowman filed a motion to withdraw his motion to rest to permit him to call an expert rebuttal witness regarding the echo test performed by Bauer during the stop, which motion was overruled by the court following a hearing held on February 15.

On April 5, 2013, the court entered an order denying Bowman's motion to suppress and motion for a *Daubert* hearing. The court found that the initial stop of Bowman was valid because of Bauer's testimony that he was speeding; that a reasonable person in Bowman's position would have felt free to leave after Bauer completed writing the warning; that he voluntarily consented to the search and did not withdraw his consent; and that the officers had probable cause and consent to search the spare tire. The court rejected Bowman's *Daubert* claim because the State did not attempt to qualify Bauer or Moody as experts in any field, nor did they undertake to perform a scientific examination or study or to express an expert opinion. On April 16, the court overruled Bowman's other pending motions.

A jury trial was held on October 8 and 9, 2013. Vicky Cowan, a forensic chemist for the Nebraska State Patrol crime laboratory (crime lab), confirmed that the substance found in Bowman's minivan was cocaine. Cowan testified the total weight of the cocaine was 514.20 grams. On October 9, the jury found Bowman guilty of possession of cocaine with intent to distribute 514.20 grams of cocaine.

On October 22, 2013, Bowman filed a motion for new trial due to irregularities in the proceedings and because the verdict was not supported by the evidence. Following a hearing held November 25, the court overruled Bowman's motion for new trial.

On January 6, 2014, the court sentenced Bowman to a minimum of 20 years' and a maximum of 20 years' imprisonment, with credit for 23 days served.

Bowman timely filed this appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, Bowman assigns as error, summarized and restated: (1) The district court erred in overruling his motion to suppress, (2) the chain of custody for the seized cocaine was improperly established, (3) the district court erred in allowing the crime lab forensic chemist to testify to the weight of the seized cocaine, and (4) the district court erred in overruling his motion for mistrial during closing arguments due to the State's statements regarding Bowman's invocation of his Fifth and Sixth Amendment rights as proof of guilt.

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Rodriguez*, 288 Neb. 878, 852 N.W.2d 705 (2014). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id*.

An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013).

Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion. *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014).

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Bowman argues that his motion to suppress should have been granted because he revoked consent during the search, the tire test was unreliable and did not support probable cause, and he was detained and placed into custody without probable cause.

### (a) Revocation of Consent and Spoliation

Once given, consent to search may be withdrawn. *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010). Bowman argues that there was "ample evidence to show that Bowman revoked any consent to search the rental vehicle despite the testimonies of the police officers." Brief for appellant at 15. Bowman relies on his own testimony that although he initially gave Bauer oral consent to search the vehicle, he revoked the consent before the search began by refusing to sign the consent form presented to him by Bauer, and by telling Dowling that he wanted the investigation to stop at least five times.

As Bowman recognizes in his brief, the testimony of Bauer, Dowling, and Moody conflicts with Bowman's testimony. According to Bauer, Bowman verbally replied "yes" when she asked if he would consent to search the minivan and its contents after she asked him questions regarding whether he had any weapons, large amounts of currency, or drugs. Bauer also testified that Bowman signed the written consent to search form. Bauer testified that prior to beginning the search, she told Bowman that he could honk her patrol car's horn to get her attention if he wished to discontinue the search and demonstrated to him that the horn worked. Bowman was sitting unrestrained in the front passenger seat of Bauer's patrol car and admittedly did not honk the horn. Dowling testified that Bowman never said he wanted the search to stop and that the only conversation he had with Bowman was regarding the two spare tires in the minivan.

In reviewing findings of fact, we do not reweigh or resolve conflicts in the evidence, but will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Dalland*, 287 Neb. 231, 842 N.W.2d 92 (2014). Additionally, we resolve evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id.* The district court was presented with conflicting accounts of the events surrounding the search of Bowman's minivan, and the district court's decision to accept law enforcement's version of the facts over that of Bowman's was not clearly erroneous. The weight and credibility of the testimony of these witnesses was for the trier of fact. See *State v. Dalland, supra.*

Bowman attempts to circumvent the above propositions of law by arguing that the district court should have applied an adverse inference against the State for spoliation due to Bauer's failure to make an audio recording of the stop and due to the damaged written consent to search form.

The intentional destruction of evidence is usually referred to as spoliation. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). When spoliation is established, the fact finder may draw the inference that the evidence destroyed was unfavorable to the party responsible for its destruction. *Id.* The rationale of the rule is that intentional destruction amounts to an admission by conduct of the weakness of one's own case; thus, only intentional destruction supports the rationale of the rule. *Id.* An adverse inference drawn from the destruction of evidence is predicated on bad conduct. *Id.* See, also, *U.S. v. Wise*, 221 F.3d 140 (5th Cir. 2000). Thus, courts that have considered the issue have generally concluded that the spoliation inference is not appropriate when the destruction was not intentional. *State v. Davlin, supra.* The same rule has been applied in criminal and civil cases. *Id.*

There is no evidence in the present case to support Bowman's assertion that the court should have applied an adverse inference against the State based upon spoliation. First, with respect to the audio recording, there could be no "intentional destruction" of evidence, because there was no evidence to destroy; no audio of the traffic stop was recorded at all by Bauer. Further, Bauer provided testimony that reflected the failure to make an audio recording of the traffic stop was inadvertent and not intentional. Bauer testified that although her patrol car was equipped with a video and audio recording device that is automatically activated when the emergency light bar is activated, she must have accidentally turned off the audio earlier in the day by toggling the switch on her belt, either from moving storage boxes or from physically assisting a combative driver. Bauer explained that the audio switch can be and has accidentally been turned off in the past.

Next, with respect to the written consent form, the evidence suggests that Bowman, not Bauer, was the party that intentionally damaged the form. Bauer testified that Bowman signed the written consent form, and Bowman testified that he did not. Bauer testified that she left the written consent form in the visor of the driver's side of her patrol car during her search; Bowman was sitting unrestrained in the passenger side of the patrol car with access to the form for the duration of the search. Bauer testified that she discovered the form crumpled up and torn in Bowman's personal items during the booking process. Because there is no evidence to suggest that the State intentionally destroyed evidence, an adverse inference against the State was not warranted. The district court's findings of fact with respect to Bowman's consent to the search were not clearly erroneous.

(b) Tire Test

With respect to Bowman's arguments regarding the validity of the roadside echo or ping test performed by Bauer, we begin by noting that although Bowman appears to argue that the trial court should have granted his motion for a hearing pursuant to *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Bowman did not assign as error on appeal that the trial court erred in overruling his motion for a *Daubert* hearing. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). We therefore do not consider whether the trial court should have granted Bowman's motion for a *Daubert* hearing on the echo or ping tests employed by Bauer.

We also find it unnecessary to reach Bowman's argument that the echo or ping tests were unreliable and did not support probable cause to search the tire, because we find that Bowman's voluntary consent to search the vehicle and its contents extended to the search of the tire.

The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect? *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). The permissible scope of a search "'is *not* to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer.'" *Id.* at 563, 822 N.W.2d at 396. A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. *Id.* The general rule is that when a suspect does not limit the scope of a search and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle. *Id.* There is no bright-line rule prohibiting the opening of closed containers during a search of a vehicle conducted pursuant to general consent. *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)). See, also, *State v. Rathjen*, 16 Neb. App. 799, 751 N.W.2d 668 (2008) (concluding driver's general consent to search his truck extended to locked toolbox inside truck, particularly in light of driver's failure to object when search extended to toolbox).

Prior to obtaining Bowman's consent to search, Bauer asked him a series of questions regarding the presence of the doughnut tire in the cargo area and whether he had guns, large amounts of currency, or drugs, specifically, marijuana, cocaine, or methamphetamine. After Bauer observed Bowman's demeanor change when she inquired about drugs, she asked Bowman for his consent to search the vehicle and its contents. Thus, a reasonable person would have been on notice that Bauer was looking for drugs or weapons. The scope of a search is generally defined by its expressed object. *State v. Howell, supra.* Bowman did not limit the search of the vehicle or ask to terminate the search of the vehicle, even when he observed the removal of the extra spare tire from underneath the vehicle by Bauer and Moody and accompanied Bauer to the tireshop without protest or revoking his consent.

Additionally, rather than cutting into the tire to search inside, Bauer transported the tire to a tireshop for a tire technician to use a machine to partially remove the wheel from the rim; there was no evidence that such an action rendered the spare tire unusable or destroyed beyond its initial condition. See *State v. Howell, supra* (discussing that destruction of closed container in such manner that container could no longer be used for its intended purpose is factor to consider in objective reasonableness analysis). Cf., *United States v. Lyons*, 510 F.3d 1225 (10th Cir. 2007) (concluding that officer had probable cause to cut open spare tire following echo test, therefore finding it unnecessary to address whether driver's consent to search extended to officer's actions); *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000) (determining that law enforcement's cutting of spare tire "likely exceeded the scope of the consensual search," but concluding officers had probable cause to extend search due to hearing thudding noise inside spare tire). We conclude that under the circumstances in the instant case, the search of the tire was within the scope of Bowman's consent.

### (c) Unlawful Detention

Bowman claims that law enforcement did not have probable cause to detain him on two occasions during the encounter: when he and his vehicle were initially detained, and when he was placed into custody to travel to the tire shop in Lexington.

Bauer testified Bowman was traveling 89 m.p.h. in a 75-m.p.h. zone, measured by radar, in violation of Neb. Rev. Stat. § 60-6,186(1)(h) (Reissue 2008). A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Magallanes*, 284 Neb. 871, 824 N.W.2d 696 (2012). Although Bowman testified he was not speeding because he had his cruise control set at the posted speed limit, the court chose to believe Bauer's testimony over Bowman's, a determination of credibility we will not disturb on appeal. See *State v. Dalland*, 287 Neb. 231, 842 N.W.2d 92 (2014). We conclude Bauer's initial detention was lawful.

Bowman next argues that Bauer "had no probable cause to place [him] into custody when he was transported to the tire shop in Lexington." Brief for appellant at 21. Bowman argues the circumstances were such that a reasonable person would have believed that he or she was not free to leave, which "points to an illegal detention of Bowman," i.e., an illegal arrest. Brief for appellant at 22. Even if we were to agree with Bowman's contention that he was illegally arrested during the trip to the tire shop (a question we need not reach), no evidence was obtained as a result of this alleged illegal arrest that the district court could have suppressed. Bowman made no statements during this time, and his general consent to search his vehicle occurred prior to this alleged period of illegal custody. Evidence must be excluded as fruit of the poisonous tree if it is discovered by the exploitation of illegal police conduct. *State v. Gorup*, 275 Neb. 280, 745 N.W.2d 912 (2008). As discussed above, the trial court was not clearly erroneous in finding that Bowman voluntarily consented to the search of his vehicle and its contents and that he did not withdraw his consent. The fact that Bowman argues he was illegally detained or arrested during the time he was transported to the tireshop was irrelevant to the lawful search of the spare tire pursuant to his prior consent.

Because the evidence found inside the spare tire was the result of a lawful search and seizure, we conclude the trial court did not err in overruling Bowman's motion to suppress.

### 2. CHAIN OF CUSTODY

Bowman argues that the chain of custody for the seized cocaine was improperly established because the State mailed the evidence to the crime lab for analysis, which Bowman claims was a violation of federal law.

Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011). Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *Id.* Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis. *Id.* Our review concerning the admissibility of such evidence is for an abuse of discretion. *Id.*

Bowman admits in his brief that "the State was able to show a continuous chain of custody regarding the seized cocaine," but argues that "some of the essential links in that chain were forged through an arguable violation of federal law." Brief for appellant at 23. Bowman's claimed federal law violation is based upon the testimony from a State evidence technician stating that she sent the cocaine via certified mail to the crime lab, which Bowman claims was a violation of 21 U.S.C. § 863 (2000) (making it unlawful for person to use mail to transport drug paraphernalia). Bowman recognizes that the Nebraska Supreme Court in *State v. Ruzicka*, 202 Neb. 257, 274 N.W.2d 873 (1979), approved of law enforcement utilizing registered mail to transport controlled substances for testing and that proof of the use of certified mail was sufficient to establish the chain of custody. However, Bowman argues that 21 U.S.C. § 863 was enacted subsequent to that case and that therefore *Ruzicka* has been "undercut." Brief for appellant at 24.

We begin by noting that the cocaine evidence mailed by the State in the instant case is not "drug paraphernalia" as defined by 21 U.S.C. § 863. That section applies to the "equipment . . . primarily intended or designed for use in . . . otherwise introducing into the human body a controlled substance." 21 U.S.C. § 863(d). Cocaine is defined as a "controlled substance" under 21 U.S.C. § 802(6) (2009), not drug paraphernalia. Second, even if the seized cocaine was considered "drug paraphernalia," 21 U.S.C. § 863(f)(1) provides that the prohibition on mailing drug paraphernalia does not apply to "any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items." It is clear that this section does not apply to local law enforcement handling seized evidence, and there was no federal law violation on the part of the State in mailing the seized cocaine to the crime lab. As Bowman otherwise concedes that the State was able to show a continuous chain of custody regarding the seized cocaine, we find this assignment of error without merit.

### 3. ADMISSIBILITY OF TESTIMONY REGARDING WEIGHT OF COCAINE

Bowman argues that the testimony of the State's forensic chemist, Cowan, regarding the weight of the seized cocaine was erroneously introduced at trial because she did not adequately provide foundation that the scale she used had been properly calibrated. We disagree.

The adequacy of the foundation regarding the accuracy of the scale used to weigh a controlled substance is required to be determined by the court before evidence of weight may be admitted. See *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013). At a minimum where accuracy is claimed based on calibration, the details of the object by which calibration is satisfied should be described. *Id.* Foundation regarding the accuracy and proper functioning of the device is required to admit evidence obtained from using the device applies when the electronic or mechanical measuring device at issue is a scale used to weigh a controlled substance. *Id.* An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *Id*.

In *State v. Richardson, supra*, the Nebraska Supreme Court concluded that the weight of cocaine measured by the State's chemist was improperly admitted because there was inadequate foundation regarding the scale's accuracy. In that case, although the chemist testified that the calibration of the scale in the crime lab was checked once a week, she did not provide further

testimony regarding the procedures used to perform such calibration and whether such calibration involved testing against a known weight. The court concluded:

> The foundation needed to be more specific to the particular scale used in this case, such as the time period during which the scale was calibrated prior to the weighing of the cocaine and greater detail regarding the procedures used in the calibration, including specifically whether the scale was tested against a known weight.

*Id.* at 857, 830 N.W.2d at 190.

In the instant case, Cowan's testimony amply established foundation that the scale she used had been adequately calibrated prior to weighing the seized cocaine. Cowan testified that the equipment in the crime lab she uses to weigh substances is a "Mettler Toledo Balance" and that a service representative from the company that manufactures the balance comes in once a year to clean, service, and certify the balance. Cowan testified that she does a weekly check of her scale using weights specifically designed to be used for testing the balance of the scale. The specific weights are identified and certified as being that weight in order to test the balance and are traceable weights that are provided to her and are sent in every 5 years to be tested to make sure that they are still their correct weight. Cowan testified that she does a weekly check against the weights and marks the scales down as being accurate. Cowan testified that on October 1, 2013, through the balance of that week, the scale she used to weigh the cocaine in the instant case was certified as accurate. Cowan testified that she took possession of seized evidence on October 2, with a request to weigh the contents, and she weighed it on that date. Cowan testified that the scale she used had been tested that week to certify that it was still operating properly.

We conclude that Cowan's testimony provided adequate foundation regarding the accuracy and proper functioning of the scale she used to weigh the cocaine and that the trial court did not abuse its discretion in admitting the evidence of the weight of the cocaine.

### 4. FAILURE TO GRANT MISTRIAL DURING CLOSING STATEMENTS

Bowman contends that the district court erred in overruling his motion for a mistrial made in response to the State's use of Bowman's postarrest silence and request for counsel as evidence of his guilt during closing arguments.

It is incumbent upon the appellant to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006). Where it is claimed that an attorney is guilty of misconduct in arguing a case to a jury and it is desired to raise a question on that point for a decision of the appellate court, it is necessary that objection be made to the trial court at the time and an adverse ruling had thereon and that the same be made a part of the record by a proper bill of exceptions. *State v. Sorbello*, 232 Neb. 486, 440 N.W.2d 696 (1989); *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980). Where the record presented on appeal fails to include the argument in which the alleged misconduct took place, the appellate court is not permitted to consider the assignment of error. See *id*.

In the instant case, Bowman makes assertions regarding statements made by the prosecutor during closing argument. However, neither party requested a record to be made of the closing arguments themselves. Although the record indicates that arguments were made and that

a bench conference was held wherein Bowman requested a mistrial, we are unable to review the prosecutor's statements or context in which they were given. As such, the record does not permit us to review Bowman's assignment of error.

## VI. CONCLUSION

We conclude that the trial court did not err in admitting the evidence of the seized cocaine and that proper foundation was provided for its weight. The closing statements were not presented to us for our review on appeal, and therefore, we cannot consider Bowman's remaining assignment of error.

AFFIRMED.